UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

_____
                                   )
TAIWO SOLOLA,                      )
                                   )
     Plaintiff,                    )
                                   )
          v.                       )
                                   )
PROSPECT CHARTERCARE RWMC, LLC,    )
d/b/a Roger Williams Medical Center;)
PROSPECT CHARTERCARE RWMC, LLC;    )   C.A. No. 16-35 WES
and PROSPECT CHARTERCARE, LLC,     )
                                   )
     Defendants,                   )
                                   )
          v.                       )
                                   )
SODEXO OPERATIONS, LLC.            )
                                   )
     Third Party Defendant.        )
_____)

**MEMORANDUM AND ORDER**

Before the Court is Defendant Prospect CharterCARE's Motion for Summary Judgment (ECF No. 52) and Third Party Defendant Sodexo Operations, LLC's Motion for Summary Judgment (ECF No. 51). Plaintiff has objected to both (ECF Nos. 56 and 57, respectively). For the following reasons, the Court GRANTS both Defendants' motions.[1]

---

[1] Because the Court grants Defendants' motions, it need not address the issue of whether Sodexo and PCC were "joint employers." See Pl.'s Mem. in Supp. of Obj. to PCC's Mot. Summ. J. ("Pl.'s Mem.") 4-5, 39, ECF No. 56-1.

I. Background

Plaintiff, Taiwo Solola, is a sixty-six-year-old African American man who speaks with a strong Nigerian accent and who characterizes himself as a "modest man who is less capable of winning arguments or defending himself verbally, than most." Am. Compl. ¶¶ 22, 24. He obtained a Bachelor of Science in Hotel, Restaurant & Institutional Management from Johnson & Wales University in 1985 and worked as a cook at Roger Williams Medical Center ("RWMC") for twelve years, from February 9, 2002, until November 24, 2014. Id. ¶¶ 8-9. Although he acknowledges that he occasionally received written disciplinary warnings while employed at RWMC, he maintains that he "was frequently recognized by his peers and superiors as a person who consistently went above and beyond the normal call of duty" and received several job performance evaluations stating that he "[e]xceed[ed] [e]xpectations." Id. ¶¶ 12-13, 18.

Prospect CharterCARE ("PCC"), d/b/a Roger Williams Medical Center, is a Rhode Island corporation that provides inpatient and outpatient healthcare services to the public. Id. ¶ 3. Sodexo Operations, LLC managed and operated the food and nutrition services for PCC and employed several of the managers at RWMC whose actions are at issue in this case, namely: Richard Giuntoli, the General Manager of RWMC's dietary department; and Steven Finegan, the

Executive Chef at RWMC. Sodexo's Statement of Undisputed Facts ("SSUF") ¶¶ 4-5, ECF No. 51; Am. Compl. ¶¶ 16-17.

Giuntoli and Finegan began working as Solola's supervisors in 2011 and 2012, respectively. Id. ¶¶ 16-17. Solola alleges that Finegan was a poor manager who frequently failed to order a sufficient quantity of food and claims he occasionally reported this issue to Giuntoli, who was Finegan's superior. Id. ¶¶ 37-38; PCC's Statement of Undisputed Facts ("PCCSUF") ¶ 22, ECF No. 53. According to Solola, Finegan and Giuntoli retaliated against him for making these reports by treating him less favorably than white employees and by talking down to him. Id. ¶¶ 20, 25-26, 39-40.

The series of events leading to Solola's termination began in the fall of 2014. On September 30, 2014, Mr. Solola was involved in a verbal altercation with a white employee, Michael Carmone.[2] Id. ¶¶ 66-69; PCCSUF Ex. Q, ECF No. 53-17. The Human Resources Site Administrator, Renee Iezzi, investigated the situation, taking statements from Carmone, Solola, and several witnesses. See Am. Compl. ¶¶ 50; PCCSUF Ex. D, Iezzi Dep. 25:6-23, ECF No. 53-4. Based on that investigation, RWMC issued both employees a "[f]inal [w]arning" on October 1, 2014, which Solola understood to mean that

---

[2] Although the Amended Complaint alleges that Carmone physically assaulted Solola during this altercation, Solola appears to acknowledge in his Opposition that the September 30 altercation was strictly verbal in nature. However, as discussed infra, he maintains that a physical altercation took place at some point. See Pl.'s Mem. in Opp'n to PCC's Mot. Summ. J. ("Pl.'s Mem.") 9, ECF No. 56-1.

3

he could be immediately terminated for future performance issues. PCCSUF Ex. Q; Ex. M, ECF No. 53-13; Ex. C, Solola Dep. 119:14-15, ECF No. 53-3 ("Q: What did you understand final warning to mean? A: Anything that happened after that is discharge.").

Thereafter, on two occasions in November of 2014, Solola failed to make the correct meals. On November 17, Solola failed to make the cranberry sauce to be served with patients' turkey dinners. PCCSUF ¶ 49; see also Am. Compl. ¶ 70. On November 19, Solola failed to make the correct number of salads. PCCSUF ¶ 50; see also Am. Compl. ¶ 70. While it is disputed whether Solola failed to make five salads or twenty salads, all witnesses to the incident (including Solola himself) agree that he did not make the correct number of salads on November 19; the only real dispute goes to why he did not do so. See Pl.'s Mem. in Supp. of Obj. to PCC's Mot. Summ. J. ("Pl.'s Mem.") Ex. 2, Crawshaw Aff. ¶ 7, ECF No. 56-3.

Also on November 19, the shift lead, Jamie Hayes, reported the missing food to Finegan and Giuntoli who proceeded to inform Iezzi about the situation. Pl.'s Mem. 13-14; PCCSUF ¶¶ 51-55. Iezzi interviewed Solola as part of her investigation into the incident and Solola defended himself by explaining that he had not made the correct number of salads because Finegan had failed to order enough food. Pl.'s Mem. 15-18. Solola was suspended from work on November 20, 2014; the next day, he sent Iezzi a letter explaining that the real reason he had failed to make the salads was because he had

4

received a phone call about his sister's failing health and that that news had adversely affected his workplace performance. Id. at 15-16. However, Solola has since claimed that he wrote that statement in Finegan's presence and at his instruction and now avers that his sister's health had nothing to do with the salad incident. Id. at 16 n.23; see also Solola Dep. 139:7-140:20.

On November 25, 2014, PCC terminated Solola, citing the following reasons: he was on a final written warning, he had twice failed to make the correct meals, and he had failed to wear his work uniform "on occasions in November 2014." PCCSUF ¶¶ 70-73. Giuntoli and Iezzi met with Solola in person to inform him that he was being terminated. Id. ¶ 74. Solola reiterated his defense that Finegan had not ordered enough food for the kitchen and the missing salads and cranberry sauce were therefore not his fault. Pl.'s Mem. 17-18, 21, 24. At the conclusion of the meeting, Solola refused to sign the discharge notice and agreed to write his own statement instead. Pl.'s Mem. 19, 23.

In that statement, dated November 30, 2014, Solola claimed that the allegations against him were "false and inaccurate" because Finegan had failed to order sufficient food for the kitchen and, therefore, Solola should not have been blamed for the missing salads. PCCSUF Ex. T, ECF No. 53-20. On January 15, 2015, he submitted a supplemental statement in which he again argued that the allegations about missing salads were "false and inaccurate"

5

because they were really caused by Finegan's poor ordering skills; he also claimed that Giuntoli had warned him not to say anything about Finegan's mismanagement during the termination meeting. Id. Ex. U. Sometime thereafter, Solola also called Iezzi to verbally explain that the missing salads were not his fault. Solola Dep. 239:3-241:13.

On April 29, 2015, Solola filed a Charge of Discrimination at the Rhode Island Commission for Human Rights ("RICHR"), naming PCC, Giuntoli, and Finegan as respondents. Am. Compl. ¶ 55. All three jointly responded to that Charge on September 16, 2015, asserting that Solola's termination was based on "significant documentation detailing deficiencies in Solola's performance" in addition to the fact that he failed to make the requisite amount of food on November 17 and 19, 2014, after receiving a final written warning in September of 2014. Id. ¶¶ 56-70. The response also included various exhibits documenting Solola's workplace misconduct between 2003 and 2014.[3] Pl.'s Obj. to PCC's Mot. for Summ. J., Ex. 1 ("Resp. to RICHR Charge"), ECF No. 56-2; see also PCCSUF, Exs. F-Q, ECF Nos. 53-6–53-17.

---

[3] PCC identified seven instances of misconduct between 2003 and 2014, including two incidents in which Solola directed profanities or racial epithets towards a co-worker and occasions where Solola violated food safety protocols. See PCCSUF ¶¶ 28-34.

On September 16, 2016, Mr. Solola filed an Amended Complaint[4] in this Court alleging that he was the victim of racial discrimination. Specifically, he alleges that he was "denied the privileges, benefits and entitlements of his employment because of the color of his skin," that he was "treated more harshly, more disparately and in a manner less favorably than his white employee counterparts," and that Defendants "create[ed] a hostile environment for Plaintiff to work in based on racial discrimination against Plaintiff who is black and in favor of similarly situated former coworkers of Plaintiff who were white." Am. Compl. ¶¶ 84, 88.

II. Legal Standard

Under the McDonnell Douglas framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973). Where the complaint alleges wrongful termination based on racial discrimination, a prima facie case requires the plaintiff to prove by a preponderance of the evidence that: (1) the plaintiff is "a member of a protected class"; (2) he was "qualified for the employment he held"; (3) "his employer took an adverse employment action against him"; and (4) "his position remained open for (or

---

[4] The Court dismissed Plaintiff's original Complaint under 12(b)(6) on August 17, 2016, Mem. & Order (ECF No. 11) but gave him thirty days to amend his complaint to cure the deficiencies, which he did.

7

was filled by) a person whose qualifications were similar to his." Conward v. Cambridge Sch. Comm., 171 F.3d 12, 19 (1st Cir. 1999).

Establishment of a prima facie case creates a presumption that the employer unlawfully discriminated against the employee, which the employer must rebut by articulating a legitimate, nondiscriminatory reason for the termination. See Oliver v. Digital Equip. Corp., 846 F.2d 103, 108 (1st Cir. 1988). If the defendant-employer meets this burden, then the presumption of discrimination falls away, and the plaintiff must demonstrate that the proffered reason was not the true reason for his termination but was merely a pretext for racial discrimination. Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981). At this final stage, the plaintiff's burden to show pretext "merges with the ultimate burden of persuading the court that [he] has been the victim of intentional discrimination." Id. It is not enough for the plaintiff to show that he "has been discharged unfairly, even by the most irrational of managers, unless the facts and circumstances indicate that discriminatory animus was the reason for the decision." Smith v. Stratus Computer, Inc., 40 F.3d 11, 16 (1st Cir. 1994) (emphasis added).

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled

to a judgment as a matter of law." Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC, 752 F.3d 82, 97 (1st Cir. 2014); Fed. R. Civ. P. 56(c). "Even in employment discrimination cases where elusive concepts such as motive or intent are at issue, summary judgment is appropriate if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." Benoit v. Tech. Mfg. Corp., 331 F.3d 166, 173 (1st Cir. 2003) (quotation marks omitted). "Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors [including:] the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148-49 (2000).

"The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993). Therefore, "rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination," but it will not compel a finding of liability. Id. Rather, where "the record conclusively reveal[s] some other, nondiscriminatory reason for the

employer's decision or if the plaintiff create[s] only a weak issue of fact as to whether the employer's reason was untrue and there [is] abundant and uncontroverted independent evidence that no discrimination ha[s] occurred," then the employer is entitled to judgment as a matter of law. Reeves, 530 U.S. at 148.

III. Discussion

Solola has made out a prima facie case of discrimination: he has alleged that he is an African American man who was qualified for the position of cook at RWMC by reason of his experience and education and who was terminated from that position in November of 2014. Am. Compl. ¶¶ 8-9, 22, 44. Though not alleged in his pleadings, he has also submitted evidence from a former co-worker that PCC filled the now-vacant cook position with a white cook. Crawshaw Aff. ¶ 18 ("[PCC] replaced [Solola] with a white cook."). In response, PCC has proffered a legitimate, non-discriminatory reason for terminating Solola, namely, that Solola failed to make the requisite number of salads on November 19, 2014, after receiving a final written warning on October 5, 2014. See PCC's Mem. in Supp. of Summ. J. ("PCC's Mem.") 1, ECF No. 52; Sodexo's Mem. in Supp. of Summ. J. ("Sodexo's Mem.") 1, ECF No. 51-1.

Solola argues that PCC's proffered reason for terminating him was merely a pretext for racial discrimination. He contends that there exists a "quintessentially genuine issue of material fact in dispute" as to whether he was "the type of person that would do

whatever he could to help others . . . whose work ethic was exemplary . . . or was instead, as [PCC] asserts, an employee who, failed to properly perform his job duties at a time when he was already on a final written warning." Pl.'s Mem. 4 (quotation marks omitted). Specifically, Solola states:

> If the finder of fact believes that the reason Mr. Solola was not able to serve patients salad was because his supervisors failed to provide enough lettuce . . . and if the finder of fact believes Mr. Crawshaw that the number of missing salads was 5 rather than 20; and if the jury believes Mr. Crawshaw that other cooks were short on various food items and were not disciplined, then the finder of fact will be entitled to conclude that [PCC's] assertion that Mr. Solola was terminated for failure to make salads was a pretext for discrimination.

Pl.'s Mem. 31. The question before the Court is whether Solola has submitted sufficient evidence to demonstrate that PCC's proffered reason for terminating him was pretextual.

Solola argues that PCC's reasons for terminating him were false and that this falsity, in itself, proves that PCC's reasons were pretextual. First, Solola asserts he never should have received a final written warning because he was "not the aggressor" in the verbal altercation with Carmone. Id. at 8, 11 ("Giuntoli and Finnegan [sic] intentionally and falsely mischaracterized the altercation as Mr. Solola having equal blame with Mr. Carmone for the specific purpose of building a case to support Mr. Solola's termination for a discriminatory reason unrelated to Mr. Solola's job performance."). Then he argues that the number of missing

11

salads was exaggerated from five to twenty and that the salad shortage was actually caused by Finegan's poor ordering skills, not by Solola's inadequate job performance. Id. at 31. Lastly, he claims that he was subjected to harsher discipline than his similarly situated white co-workers. Id. at 11. According to Solola, all of these circumstances were orchestrated by Giuntoli, and Finegan as part of a broader conspiracy to fire him because of his race. Id. at 12, 30.

Taking all reasonable inferences in the light most favorable to Solola, the Court concludes that none of these facts – whether viewed on their own or taken together – are sufficient to demonstrate that PCC's reasons for terminating Solola were merely a pretext for racial discrimination.

A. The Final Written Warning

Solola admits that he was involved in the altercation with Carmone but contends that he should have been found completely "blameless" because he was not the instigator. Id. 9, 12 ("Ms. Iezzi determined that an inappropriate verbal altercation had occurred between Plaintiff and Mr. Carmone. Ms. Iezzi should have determined that Mr. Carmone was the aggressor and Mr. Solola was blameless."). Though Solola clearly disagrees with Iezzi's decision to give him a final written warning, he has not "elucidate[d] specific facts which would enable a jury to find" that the reason he received a final written warning was because of

his race. Mesnick v. General Elec. Co., 950 F.2d 816, 824 (1st Cir. 1991) (quotation marks omitted). He claims only that her investigation was flawed because "[t]he fact that Mr. Carmone was the instigator was glossed over and not properly investigated." Pl.'s Mem. 9. However, "Courts may not sit as super personnel departments, assessing the merits – or even the rationality – of employers' nondiscriminatory business decisions." Mesnick, 950 F.2d at 825. As such, it is irrelevant whether Iezzi "glossed over" the fact that Carmone instigated the altercation unless Solola can show that her oversight was racially motivated. He has not done so and, indeed, would be hard-pressed to do so here, since he and Carmone received identical discipline for the altercation. PCCSUF Exs. M, Q, ECF Nos. 53-13, 53-17.

B. Allegations of Disparate Disciplinary Treatment

To prove pretext based on disparate treatment, Solola must show "that others similarly situated to him in all relevant respects were treated differently by the employer." Conward v. Cambridge Sch. Comm., 171 F.3d 12, 20 (1st Cir. 1999). While Solola's case and "the comparison cases he advances need not be perfect replicas, they must closely resemble one another in respect to relevant facts and circumstances." Id.

Solola claims that he was treated "less favorably than . . . similarly situated white cooks" and argues that this "suggest[s] an inference of discriminatory motive" for his termination. Pl's Mem.

13

37. The most specific allegation of disparate treatment that Solola offers is his claim that Giuntoli and Finegan refused to discipline Carmone for punching Solola and instead threatened to give Solola a bad evaluation if he reported the incident to human resources. Id. at 29, 36. In Solola's view, these allegations prove that Giuntoli and Finegan "treated a similarly situated white employee more favorably than Taiwo." Id. at 36. However, Solola has not pointed to any facts about when or where this alleged assault happened, whether other employees witnessed or heard about the assault, or anything else that might allow the Court to compare PCC's treatment of Solola with its treatment of Carmone in this instance. The only evidence in the record related to this incident is Solola's bald allegation that it occurred; this is insufficient to defeat a motion for summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986) ("Rule 56(e) itself provides that a party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial."); Cannon-Atkinson v. Cohen, 95 F. Supp. 2d 70, 73 (D.P.R. 2000), aff'd, 6 F. App'x 44 (1st Cir. 2001) ("It is well-settled law that a plaintiff must do more than state bald allegations; without more, summary judgment must be granted to a defendant.")

14

The rest of Solola's allegations about his disparate treatment are even more vague and conclusory.[5] For example, Solola "maintains that Giuntoli and Finegan were quick to impose discipline for alleged misconduct on the part of Solola while being reluctant to impose discipline for similar alleged misconduct on the part of Solola's white coworkers." Am. Compl. ¶ 21; Pl.'s Mem. 3. To substantiate this allegation, he claims that he was terminated for failing to wear his work uniform while other cooks, namely Carmone, "didn't wear [their] chef coat and no disciplinary action was taken against [them]." Crawshaw Aff. ¶ 10; Pl.'s Mem. 28. Even assuming this is true, it is impossible for the Court to speculate as to why Carmone (or any other cook) was not disciplined for failing to wear his uniform because Solola has not adduced any evidence about Carmone's "comparison case," i.e., when it occurred, whether PCC was even aware of the infraction, whether Carmone gave a defensible

---

[5] See, e.g., Crawshaw Aff. ¶ 5 ("Taiwo was terminated for things that are still happening at [PCC], and for things that before he was fired, had not been considered fire-able offenses."); ¶ 6 ("Taiwo was terminated for allegedly failing to make 20 salads. However, another employee forgot to make 11 salads and was not disciplined. Other cooks have been short on food product and were not terminated."); Id. ¶ 14 ("Finegan treated Taiwo differently than how he treated others. Steve took advantage of the fact that Taiwo wouldn't fight back or defend himself. Steve bullied Taiwo and said things to Taiwo that he wouldn't say to any other cooks."); see also Pl's Mem. 3 ("Mr. Solola also pled in his Amended Complaint that he was treated differently and less favorably than the white cooks employed by [PCC]."); Id. at 12 ("Mr. Solola knew he was on a final warning but simultaneously believed he was being targeted by Mr. Giuntoli and Mr. Finnegan [sic] and being treated much less favorably than Mr. Carmone.").

15

reason for failing to wear his uniform, whether the infraction occurred while Carmone was on a final written warning, etc. Conward, 171 F.3d at 20. These are the "relevant facts and circumstances" necessary for the Court to determine whether "others similarly situated to [Solola] in all relevant respects were treated differently by the employer." Id. Without that information, a finding of disparate treatment would be purely speculative. Mesnick, 950 F.2d at 826 (holding that the court is "under no obligation to draw unreasonably speculative inferences in mulling whether the plaintiff fulfilled his burden of adducing 'specific facts showing that there is a genuine issue for trial.'") (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

C. The Salad Incident

Solola argues that the missing salad incident was exaggerated in that only five salads were missing, not twenty, and claims that the shortage was entirely Finegan's fault, not his own. He also argues that Iezzi's investigation into the missing salads was fraudulent because "neither Ms. Iezzi nor Mr. Gintoli [sic] conducted an investigation into food shortages [by] interview[ing] James Crawshaw." Pl.'s Mem. 15, 24. In Solola's view, the combination of these errors proves that the salad incident was a pretext for race discrimination.

First, Solola's criticisms about the thoroughness of Iezzi's investigation are irrelevant to the issue of pretext because he

16

admits that she was not motivated by race discrimination. After explaining that he believed the investigation was flawed, Solola acknowledged in his deposition that those flaws had "nothing to do with race":

> Q: And so did I understand this completely, you don't suggest that they failed to investigate because of your race, is that right?
>
> A: Why am I going to say that of my race? No. They investigate to get to the bottom of the facts of the story. That doesn't bring race to it, nothing to do with his race.

Solola Dep. 310:9-15. Moreover, Solola admitted to Iezzi during her initial investigation that he had not made sufficient salads but blamed his error on external forces: first, he blamed it on his preoccupation with his sister's failing health; later he blamed it on Finegan's inability to order sufficient food. Pl.'s Mem. 15-16. There is no indication that Iezzi believed these excuses yet nonetheless terminated him; rather, she rejected his excuses. See Iezzi Dep. 16:22-17:16; 27:4-30:8. In assessing whether the Iezzi's reason for terminating Solola was pretextual, "what matters is not whether the investigation was poorly done, unfair, or even whether [Solola] in fact engaged in misconduct. Rather, the crucial inquiry is whether [Iezzi] believed that [Solola] engaged in misconduct and whether [she] terminated [him] based upon that belief." Gordon v. EarthLink, Inc., No. CV 14-14145-FDS, 2017 WL 3203385, at *9 (D. Mass. July 27, 2017); see also Kouvchinov v. Parametric Tech. Corp., 537 F.3d 62, 67 (1st Cir. 2008) ("[T]he anti-discrimination laws do

17

not insure against inaccuracy or flawed business judgment on the employer's part; rather they are designed to protect against, and to prevent, actions spurred by some discriminatory animus.").

Similarly, whether Solola was short five salads or twenty salads is irrelevant to the issue of pretext because, in either case, Solola admits that he failed to make the correct number of salads on November 19, 2014. See, e.g., Pl.'s Mem. 13. Likewise, whether the salad shortage resulted from Finegan's failure to order enough lettuce, rather than from Solola's failure to perform the duties of his job, is ultimately irrelevant. At the pretext stage, this Court's task "is limited to determining whether the employer 'believed[d] in the accuracy of the reason given for the adverse employment action,'" not whether the adverse employment action, itself, was fair or correct. Espinal v. Nat'l Grid NE Holdings 2, LLC, 693 F.3d 31, 35 (quoting Kouvchinov, at 67 (1st Cir. 2008)).

Here, taking all inferences in the light most favorable to Solola, he has proved, at most, that PCC's decision to fire him was arguably unfair, given that his job performance was so hindered by an (apparently) inept supervisor. He has not, however, produced any competent evidence demonstrating that this unfairness was racially motivated. Mesnick, 950 F.2d at 824 (1st Cir. 1991) ("It is not enough for a plaintiff merely to impugn the veracity of the employer's justification; he must 'elucidate specific facts which would enable a jury to find that the reason given is not only a

sham, but a sham intended to cover up the employer's real motive: [race] discrimination.'" (quoting Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 9 (1st Cir. 1990))). Because there is "abundant and uncontroverted independent evidence in the record indicating that no discrimination occurred," the Court finds that there is no genuine dispute of materia+l fact on the issue of pretext and that Defendants are therefore entitled to judgment as a matter of law. Reeves, 530 U.S. at 148.

IV. Conclusion

For the above stated reasons, Defendants' Motions for Summary Judgment (ECF Nos. 51 and 52, respectively) are GRANTED.

IT IS SO ORDERED.

/s/ William E. Smith
William E. Smith
Chief Judge
Date: March 27, 2019